IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AMERICAN DAIRY QUEEN,

                          Plaintiff,                          OPINION AND ORDER

        v.                                                    21-cv-378-wmc

DAVID WINEINGER,

                          Defendant.

For more than 20 years, David Wineinger has operated a Dairy Queen franchise in Sparta, Wisconsin.  In early 2021, when Wineinger decided to retire, he notified American Dairy Queen that he wanted to sell his franchise.  American Dairy Queen responded that it would approve a transfer of the franchise only if the new owner agreed to sign an updated franchise agreement reflecting its current standards.  In response, Wineinger asserted that his existing franchise agreement prohibited American Dairy Queen from requiring a new owner to sign a different agreement.  American Dairy Queen then filed this lawsuit for declaratory judgment that it has a contractual right to approve or deny a transfer of Wineinger's franchise and that it may condition approval on the buyer signing a new franchise agreement.  Wineinger counterclaimed for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the Wisconsin Fair Dealership Law, Wis. Stat. ch. 135 *et seq*.

Before the court are the parties' cross motions for summary judgment.  (Dkt. ## 27, 31.)  The court will grant plaintiff's motion and deny defendant's motion because the parties' existing franchise agreement is unambiguous and grants American Dairy Queen the discretion to approve, reject or condition Wineinger's transfer of his rights under the agreement. American Dairy Queen did not breach the contract, violate the implied covenant of good faith

and fair dealing, or violate the Wisconsin Fair Dealership Law by requiring a prospective owner to sign an updated franchise agreement.

## UNDISPUTED FACTS[1]

### A.   The Parties

Plaintiff American Dairy Queen owns and operates the Dairy Queen franchise system. Defendant David Wineinger is a Dairy Queen franchisee and has held, at various times, an ownership interest in four franchise locations, including a Dairy Queen store in Sparta, Wisconsin, which he has operated since 1998.

American Dairy Queen is a citizen of Delaware and Minnesota and Wineinger is a citizen of Wisconsin.  The amount in controversy between them is more than $75,000, so the court has diversity jurisdiction over their dispute under 28 U.S.C § 1332.

### B.   The 1952 Sparta Dairy Queen Franchise Agreement

The Sparta Dairy Queen opened in 1952, and has operated ever since under the same, two-page franchise agreement dated April 1, 1952 ("1952 Franchise Agreement").  Originally executed by both American Dairy Queen's and Wineinger's predecessors in interest, plaintiff American Dairy Queen acquired its interest in the 1952 Franchise Agreement in 1967, and defendant Wineinger acquired interest in the agreement in 1998.

The 1952 Franchise Agreement grants "the dealer," now Wineinger, the "exclusive right" to use the Dairy Queen trademark to sell frozen treats within the property limits of the

---

[1] The background facts are undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence as appropriate.

City of Sparta and a five-mile radius around the city.  By its terms, the agreement also automatically extends for unlimited five-year terms after the initial term expires in 1957.  (1952 Franchise Agreement (dkt. #33-1) ¶¶ 3(a), 5.)  The agreement requires the dealer to "meet the standards of quality and specifications" set by American Dairy Queen and to purchase certain items from American Dairy Queen approved suppliers.  (*Id.* ¶ 4(l).)  The original agreement also requires the dealer to pay American Dairy Queen 34 cents per gallon on all dairy mix used to make frozen treats.  (*Id.* ¶ 4(b).)

The 1952 Franchise Agreement contains the following provision addressing transfers and assignments:

> This Agreement shall be binding upon the heirs, executors, administrators, successors, and assigns of the parties hereto, provided that the "Dealer" may not transfer or assign any of his rights under this Agreement without the approval of the "Licensee" in writing to such transfer or assignment.

(*Id.* ¶ 8.).  Over the years, American Dairy Queen has approved five transfers and assignments of the agreement, each time allowing new transferees to operate under the terms of the same 1952 Franchise Agreement.

The parties agree that some of the provisions of the 1952 Franchise Agreement are outdated.  For example, the agreement contains numerous provisions relating to the use, maintenance, inspection and location of freezers that are no longer in use in Dairy Queen stores.  The 1952 Agreement also refers only to the "Dairy Queen" trademark, and does not refer to other trademarks owned by American Dairy Queen are now widely used by its franchisees, including by the Sparta store, such as:  "Blizzard," "DQ," "Dilly" and "Arctic Rush."  In addition, the 1952 Franchise Agreement permits the dealer to sell "non-system food," meaning food products not sold under the Dairy Queen trademark.  (*Id.* ¶ 4(l).)  At the

3

time the 1952 Franchise Agreement was written and signed, Dairy Queen only sold frozen treats and had no standard food menu.  As authorized by the non-system-food provision, Wineinger has sold non-system food at the Sparta store since he assumed ownership of the Sparta Dairy Queen in 1998.

### C.   American Dairy Queen's Efforts to Modernize and Standardize its Franchise Agreements

Sometime after 1952, American Dairy Queen introduced a food system and as a standardized food menu, all in an effort to increase brand recognition, create a more uniform customer experience and decrease the administrative burdens associated with monitoring health and safety issues at non-system-food locations.  More recently, American Dairy Queen not only stopped offering new franchise agreements that allowed franchisees to sell non-system food, it started offering incentive programs to transition non-system-food locations to the standard Dairy Queen menu.

Consistent with the ongoing goal of standardizing its franchise system, American Dairy Queen implemented a new franchise transfer policy in July 2020.  Under this new policy, American Dairy Queen now only approves the transfer of a franchise if the new dealer agrees to execute the company's current standard franchise agreement.  The 2020 policy applies to any franchisee who initiates a transfer request, except for transfers between immediate family members or among shareholders of an existing Dairy Queen franchise.  The new transfer policy also permits potential grandfathering of certain terms, including royalty rates, protected territories and seasonal limitations on operations requirements.

American Dairy Queen's current franchise and operating agreements are more than 40 pages long and address food requirements, as well as numerous other items not addressed in

Wineinger's two-page, 1952 Franchise Agreement.  (*Compare* DQ Grill and Chill Operating Agreement (dkt. #33-6) *and* DQ Treat Operating Agreement (dkt. #33-7), *with* 1952 Franchise Agreement (dkt. #33-1).)  For example, the standard franchise agreements now address online, mobile and electronic marketing; contemporary trademarks and service marks; sales promotions; training and staffing; health and sanitation requirements; operating procedures; electronic payments and data security standards; computer systems standards; and facility standards.

The current franchise agreements have 15- or 20-year terms, depending on the type of menu offered, within either 10- or 15-year renewal provisions. The current franchise agreements also require new owners to pay advertising and sales promotion fees not required under the 1952 Franchise Agreement, and they do not grant exclusive territories, though American Dairy Queen may agree to grandfather the protected territory for an original 15-year term.

### D.   Wineinger's Transfer Request

In early 2021, Wineinger notified American Dairy Queen that he wanted to transfer the Sparta Dairy Queen store to new owner.  American Dairy Queen responded that any prospective buyer would have to sign the current franchise agreement as a condition of securing approval of the transfer.  American Dairy Queen also told Wineinger that:  (1) the current period of operations of the location and protected territory would be grandfathered into the new agreement; and (2) American Dairy Queen would consider making concessions on the fees that the new owner would owe under the new agreement, depending on the menu to which the buyer would convert.  Specifically, the amount of fees owed under the agreement would depend

5

on whether the new owner transitioned to a treats-only location or a system food location. American Dairy Queen stated that it would not permit the sale of non-system food at the Sparta store following a transfer.

Wineinger's potential buyer, who had offered $775,000 for the Sparta franchise, withdrew its offer upon learning that it would have to sign a new franchise agreement, although the transfer process never proceeded far enough for American Dairy Queen to determine whether the proposed buyer would satisfy its franchisee qualification requirements. Another potential buyer, who previously had offered Wineinger $825,000 for continuing the Sparta store under the 1952 Franchise Agreement, later offered Wineinger $500,000 if he had to sign a new agreement. Wineinger declined the latter offer and continued to operate the Sparta store under the terms of the 1952 Franchise Agreement.

## OPINION

In light of the dispute between the parties over Wineinger's right to sell his Sparta store location with the 1952 Franchise Agreement still in effect, American Dairy Queen initiated this lawsuit, seeking a declaration that it could condition approval of any transfer of the store location on the new owner's execution of a then current franchise agreement. Wineinger then filed a counterclaim seeking a mirror-image declaration, as well as affirmative counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of § 135.03 of the Wisconsin Fair Dealership Law. The court addresses each of these affirmative claims below.[2]

---

[2] Both sides assume that Wisconsin law governs all of the claims and counterclaims at issue, so the court has done the same. *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002) ("[T]here's no discussion of choice of law issues, and so we apply the law of the forum state.").

## I.   Breach of Contract

To begin, paragraph 8 of the 1952 Franchise Agreement states:

> This Agreement shall be binding upon the heirs, executors, administrators, successors, and assigns of the parties hereto, provided that the "Dealer" may not transfer or assign any of his rights under this Agreement without the approval of the "Licensee" in writing to such transfer or assignment.

(1952 Franchise Agreement (dkt. #33-1) ¶ 8.)   Wineinger, as the dealer, concedes that this provision prohibits him from transferring or assigning his rights under the franchise agreement without the written approval of American Dairy Queen, as the licensee.   (Wineinger's Br. (dkt. #28) 30) ("The clear language of the second portion of Paragraph 8 . . . requires Wineinger to obtain ADQ's approval of a transfer of his rights under this Agreement . . . ."); (Wineinger's Reply Br. (dkt. #49) 7) ("Wineinger has never disputed that ADQ has the ability to approve or disapprove an incoming franchisee. . . .")).   Indeed, that aspect of the contract language is plain and unambiguous, and such "no-assignment-without-consent" clauses are common and enforceable in commercial contracts.   *See Tissue Tech., LLC v. ST Paper, LLC*, 2018 WI App 45, ¶ 2, 383 Wis. 2d 603, 918 N.W.2d 128 (attempted assignment without consent violated terms of agreement because "[t]he contract provided that it could 'not be assigned by either [party] without the express prior written consent of the other'"); *Red Arrow Prod. Co. v. Emps. Ins. of Wausau*, 2000 WI App 36, ¶ 21, 233 Wis. 2d 114, 607 N.W.2d 294 (no-assignment-without-consent clause in insurance contract "makes clear that without [the insurer's] permission, no assignee or transferee has any rights to any benefits under the [insurance] policies").

Although the parties agree on the general meaning and enforceability of this provision, they disagree about the extent of American Dairy Queen's discretion to withhold written consent to a transfer or assignment.   American Dairy Queen appears to argue that its discretion

7

is unlimited, giving it an unqualified right to approve or withhold approval of any transfer of Wineinger's franchise, which is silly in light of the requirement of good faith and fair dealing in any contract under Wisconsin law, as addressed below.  At the same time, while Wineinger concedes that the provision gives American Dairy Queen *some* discretion to withhold consent, such as if a proposed buyer was financially or operationally unfit or was engaged in materially adverse competitive activities, he also argues that American Dairy Queen's discretion to deny a franchise transfer is limited only to "vetting the potential new franchisee." (Wineinger's Reply Br. (dkt. #49) 7); (Wineinger's Countercl. (dkt. #21) (Count II) ¶ 17); (Wineinger's Reply Br. (dkt. #49) 7) ("[American Dairy Queen] should consider all reasonable factors related to the proposed new franchisee's ability to run a successful Dairy Queen.").  More specifically, Wineinger argues that American Dairy Queen may *not* impose any conditions on a proposed transfer that would result in depriving Wineinger of the ability to assign the entirety of the rights and privileges of the 1952 Franchise Agreement to a new owner.

Wineinger's arguments are unpersuasive, as they all rely on a strained reading of the 1952 Franchise Agreement.  In particular, Wineinger points to the "successors and assigns" language in the first clause of paragraph 8 of the agreement, which states that the agreement "shall be binding upon the heirs, executors, administrators, successors, and assigns of the parties hereto."  (1952 Franchise Agreement (dkt. #33-1) ¶ 8.)  Wineinger argues that this language unambiguously gives him the right to assign the 1952 Franchise Agreement *as a whole*, precluding American Dairy Queen from placing any conditions on the transfer, because any other interpretation of the provision would render meaningless the "heirs, executors, administrators, successors, and assigns" language used in the agreement.

However, the standard successors-and-assigns clause on which Wineinger relies means only that the franchise agreement "shall be binding" on successors or assigns of the parties. This clause says nothing about which rights may be transferred or when, and it certainly does not mean that the whole agreement must be transferred to a new dealer "as is." To the contrary, the second clause of paragraph 8 expressly prohibits the transfer or assignment of any of Wineinger's "rights" under this Agreement without the approval of American Dairy Queen in writing." (1952 Franchise Agreement (dkt. #33-1) ¶ 8.) Thus, the language of paragraph 8 as a whole unambiguously contemplates the dealer's conditional ability to assign some, but not necessarily all, of the rights under the 1952 Agreement. *See USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 520 (7th Cir. 2022) ("Any" means "one, some, or all indiscriminately of whatever quantity.") (citation omitted). In addition, by using the words "provided that," the second clause of paragraph 8 also unambiguously grants American Dairy Queen the right to disapprove the transfer or assignment of the Agreement altogether.

For both reasons, numerous cases cited by Wineinger in support of his argument are plainly inapposite, as they do not address a clause permitting the consentor to place conditions on its consent. Instead, those cases address whether the agreement at issue was assignable at all. *See, e.g., Buchholz Ins. Agency, Inc. v. Ziegler*, 1994 WL 585702, *4, 188 Wis. 2d 603, 526 N.W.2d 279 (Ct. App. 1994); *K N Gas Supply Services, Inc. v. American Production Partnership-V, Ltd.*, 994 F. Supp. 1283, 1286 (D. Colo. 1998). Here, there is no dispute that the 1952 Agreement is assignable.

Wineinger also argues that because American Dairy Queen approved the unqualified assignment of the 1952 Franchise Agreement five times in the past, the agreement should be interpreted to permit, even require, assignment of the entire agreement without conditions or

alterations.  However, under Wisconsin law, a court is only permitted to look outside the contract to extrinsic evidence, such as the parties' course of business, if a contract provision is ambiguous and susceptible to more than one meaning.  *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996).  Here, the contract is not only unambiguous, but even if the parties' past course of business were relevant, it would not support finding American Dairy Queen in breach of the parties' contract by conditioning its approval of another transfer on the new owner signing a current franchise agreement.  First, American Dairy Queen has consistently enforced its contractual right to approve any transfer in the past, albeit under the existing 1952 Franchise Agreement, but that does not mean it must always do so into the future.  Second, American Dairy Queen has submitted undisputed, compelling evidence that:  (a) its franchise system has changed significantly since the agreement was executed in 1952; and (b) there are a number of legitimate business reasons to standardize and modernize its franchise agreements benefitting both it and its dealers as a group.

In sum, the plain terms of the 1952 Franchise Agreement give American Dairy Queen a contractual right, subject to its duty of good faither and fair dealing, to withhold approval of any proposed franchise transfer in whole or in part, and there is nothing *in the contract* limiting that right.  Accordingly, apart from proof of a violation of its implied duty of good faith and fair dealing, American Dairy Queen is entitled to summary judgment on Wineinger's breach of contract claim for conditioning its approval of Wineinger's proposed transfer.

## II.  Duty of Good Faith and Fair Dealing

Wisconsin recognizes a duty of good faith and fair dealing as being implied in every contract. *See Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 885 n. 5 (7th

Cir. 2010) (Wisconsin law).  While Wisconsin courts have described this implied duty in different ways, commonly quoted language in *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 541 N.W.2d 203 (Ct. App. 1995), provides several examples of a violation of the duty: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id*. at 797.  The Court of Appeals for the Seventh Circuit has described the duty as conduct that "denie[s] the benefit of the bargain originally intended by the parties." *Zenith Ins. Co. v. Employers Ins. of Wausau*, 141 F.3d 300, 308 (7th Cir. 1998).

Wineinger argues that because the 1952 Franchise Agreement does not specify how much discretion American Dairy Queen has in evaluating transfer requests, the court should apply the covenant of good faith and fair dealing to fill that "gap" in the contract.  (Wineinger's Opp. Br. (dkt. #41) 13.)  Specifically, he argues that the duty of good faith and fair dealing implies a "reasonableness limitation" in the no-assignment-without-consent provision, requiring American Dairy Queen to exercise its discretion "reasonably" in evaluating transfer requests.  (*Id.*)  Wineinger cites no Wisconsin cases that have read such a "reasonableness" requirement into an assignment-with-consent or similar clause in a contract, while several courts have rejected a reasonableness requirement under Wisconsin contract law unless required by the contract language itself.  For example, the plaintiff in *India Breweries Inc. v. Miller Brewing Co.*, No. 05-C-0467, 2007 WL 3012973 (E.D. Wis. Oct. 11, 2007), *aff'd*, 612 F.3d 651 (7th Cir. 2010), asked the Eastern District of Wisconsin to consider whether a contract clause prohibiting third-party brewing without written permission from Miller Brewing, impliedly required Miller to exercise reasonableness in evaluating third-party brewers.

11

*Id*. at *14.  The *Indiana Brewing* court found no ambiguity in the contract "concerning the absence of an express reasonableness requirement regarding the approval third-party contract breweries."  *Id*. at *14.  In particular, the court emphasized that "Miller did not promise to exercise reasonableness as to third-party brewers; it could reject them for any reason."  *Id*.  The *Indiana Brewing* court further found that the "absence of a reasonableness requirement was intentional," as Miller had made a reasonableness promise to other breweries, but it had clearly left out the promise with respect to third-party brewers.  *Id*.  *See also, Wausau Med. Ctr., S.C. v. Asplund*, 182 Wis. 2d 274, 294, 514 N.W.2d 34 (Ct. App. 1994) (surgeon did not breach duty of good faith and fair dealing by accepting employment at clinic even though he did not intend to remain long-term, and then terminating his contract after a short time, "because the contract contemplate[d] that he could do so at any time"); *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 51 F. App'x 786, 793 (10th Cir. 2002) (Wisconsin law) (company did not breach duty of good faith by terminating sales franchise agreement because the agreement permitted the company to terminate the franchise at will); *Smith v. Rainsoft Water Conditioning Co.*, 848 F. Supp. 1413, 1417 (E.D. Wis. 1994) (company's failure to approve dealers did not violate duty of good faith and fair dealing because the parties' agreement specifically stated that "new dealers will be subject to approval" by the company).

Other courts outside of Wisconsin have similarly declined to read a reasonableness requirement into assignment clauses. *E.g.*, *Taylor Equipment, Inc. v. John Deere Co.*, 98 F.3d 1028, 1034 (8th Cir. 1996) (South Dakota law) ("normal meaning" of no-assignment-without-approval clause is that party has an "unrestricted right to withhold approval, at least if it acts honestly"); *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 878 (5th Cir. 1989) (Michigan law) (duty of good faith and fair dealing "ha[d] no role" where the dealership

12

agreement contained a no-relocation-without-approval clause and "d[id] not limit the reasons upon which GM [could] base its relocation decisions"); *Enfield Equip. Co. v. John Deere Co.*, 217 F.3d 838, 2000 WL 991636, *1–2 (4th Cir. 2000) (unpublished) (Maryland law) (John Deere did not breach contract or violate implied duty of good faith by conditioning its approval of distributorship transfer because "the assignment provision in the dealer agreement gave John Deere the contractual right to withhold its consent to any proposed transfer for any reason, even an arbitrary one."); *James v. Whirlpool Corp.*, 806 F. Supp. 835, 840, 844 (E.D. Mo. 1992) (Michigan law) (concluding that Whirlpool had "unlimited authority to refuse assignment," and implied covenant of good faith and fair dealing did not limit that discretion).

This is not to hold that the implied duty of good faith and fair dealing has no teeth where there is a consent clause.  Instead, a denial of consent is subject to a lower standard of review than "reasonableness."  Applying that requirement here, Wineinger's claim still fails. First, under Wisconsin law, *Wineinger* bears the burden of establishing a breach of an implied duty of good faith and fair dealing.  *Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 310 (7th Cir. 2017).  Second, at minimum, he would have to "show something that can support a conclusion that the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties." *Zenith Ins. Co.*, 141 F.3d at 308; *see also Foseid*, 197 Wis. 2d at 796. Wineinger's evidence does not come close to meeting that burden of proof.

Wineinger principally argues that American Dairy Queen does not *need* a new franchise agreement to require franchise owners to comply with system standards, install approved freezers and computer systems, and refrain from selling other trademarked products, pointing out that he has been required to upgrade and update the Sparta store over the years, despite not operating under a modernized franchise agreement.  That may be true, but it does not

13

make American Dairy Queen's desire to modernize and standardize its franchise agreement across its entire dealer network unreasonable or arbitrary.  Nor does it deny Wineinger the ability to operate his Sparta Dairy Queen store, which is what he primarily purchased in 1998 in buying into that dealership under the 1952 Franchise Agreement.  Indeed, by acknowledging his agreement to system-wide standards, Wineinger essentially concedes that he and his predecessors had agreed to amendments to the original franchise agreement by a course of dealing.  In addition, Wineinger concedes that American Dairy Queen has faced administrative burdens in ensuring that franchisees operating under older, outdated franchise agreements adapt to more recent, competitive, legal, regulatory and other changes to Dairy Queen systems, Wineinger included.  (Wineinger's Resp. to PFOF (dkt. #43) ¶¶ 40–43) (conceding that he has frequently questioned American Dairy Queen's right to require him to comply with updated system standards and pushed back against those standards).)

Wineinger also argues that American Dairy Queen's actions are "unreasonable" because the new franchise agreement includes terms less beneficial to the franchisee.  Specifically, the current franchise agreement runs for a term of "only" 30 years, requires the new owner to pay more advertising and marketing fees, prohibits new owners from selling non-system food, and would grandfather in certain terms for only 15 years.  However, Wineinger has failed to explain why these details render American Dairy Queen's actions arbitrary or unreasonable, much less not implemented in good faith and fairness to dealers uniformly across its system.  For example, Wineinger does not argue that the new terms are unfair to franchisees generally or that they would preclude a franchisee from operating a successful Dairy Queen store.  Nor could he, in light of the fact that there are Dairy Queen dealers successfully operating across the country under American Dairy Queen's current form franchise agreements.  Finally, he offers nothing

14

to suggest that the changes are not necessary for the long-term competitive health of the dealer system for both franchiser and franchisees.

Rather, Wineinger concedes that the original, 1952 Franchise Agreement is now a "bad deal" for American Dairy Queen because it provides the dealer "an exclusive territory, has an unlimited term, and pays hardly any royalties." (Wineinger's Br. (dkt. #28) 28). Under such circumstances, it is neither arbitrary nor unreasonable for American Dairy Queen to require new franchise owners to sign an updated franchise agreement. *Cf. Wilson v. Career Educ. Corp.*, 844 F.3d 686, 691–92 (7th Cir. 2016) (affirming dismissal of implied covenant claim on summary judgment because, even assuming employer based its decision on financial considerations, exercising contractual discretion to respond to economic pressures was not arbitrary and did not violate any reasonable expectations of the parties).

In sum, Wineinger has failed to proffer evidence from which a reasonable jury could conclude that American Dairy Queen acted unreasonably, arbitrarily, in bad faith or deprived Wineinger of the benefit of his bargain. Thus, American Dairy Queen is entitled to summary judgment on both Wineinger's breach of contract and implied duty of good faith and fair dealing claims.

## III. Wisconsin Fair Dealership Law

Finally, Wineinger contends that American Dairy Queen's actions violate § 135.03 of the Wisconsin Fair Dealership Law ("WFDL"). That provision provides:

> No grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor.

Wis. Stat. § 135.03.  In particular, Wineinger argues that American Dairy Queen's action amounts to a "substantial change" to the competitive circumstances of the 1952 Franchise Agreement without good cause.  Unfortunately for Wineinger, even if "substantial," as long as the requirement for new dealers is "essential, reasonable and non-discriminatory," American Dairy Queen has established good cause under the WFDL.  *Ziegler Co., Inc. v. Rexnad*, 147 Wis. 2d 308, 316, 433 N.W.2d 8, 11-14 (1988); *Morley-Murphy Soc., v. Zenith Elec. Corp.*, 142 F.3d 373, 376 (7th Cir. 1998) (recognizing that *Ziegler* allowed proportionate change to an "objectively ascertainable need" if applied non-discriminatorily); *Tri-State Bobcat, Inc. v. FINN Corp.*, 971, 984-85 (D. Minn. 2018) (granting summary judgment to grantor in light of evidence that change was essential, reasonable and non-discriminatory in nature).

As an initial matter, American Dairy Queen argues that the WFDL does not apply to the relationship between American Dairy Queen and Wineinger at all, because their relationship is governed by the 1952 Franchise Agreement, which was entered into more than 20 years before the WFDL was enacted in 1974, and the Wisconsin Supreme Court has held that "retroactive application of [the WFDL] is prohibited as unconstitutional by Art. I, sec. 10 of the United States Constitution."  *Wipperfurth v. U-Haul Co. of W. Wisconsin*, 101 Wis. 2d 586, 599, 304 N.W.2d 767 (1981).  Wineinger responds that because the 1952 Franchise Agreement was amended in 1995, to expand the product lines that the Sparta location was permitted to sell to include "Mr. Misty" frozen slush drinks, that amendment brought the franchise under the reach of the WFDL.

The court need not resolve that dispute, however, because assuming that the WFDL applies, American Dairy Queen did not violate it.  First, Wineinger has failed to show that American Dairy Queen's actions constitute a "substantial change to the competitive

16

circumstances" of the dealership agreement.  *See Bresler's 33 Flavors Franchising Corp. v. Wokosin*, 591 F. Supp. 1533, 1537 (E.D. Wis. 1984) (dealer bears the burden of demonstrating that competitive circumstances have been substantially changed).  Second, American Dairy Queen has shown that its objectively ascertainable need for uniformity in updating its franchise agreements for new dealers is applied in a non-discriminatory manner.

A "substantial change to the competitive circumstances" of a dealership agreement means a discriminatory change or one "so severe as to threaten the dealership's viability."  *Id.*; *see also Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1241 (7th Cir. 1986) (§ 135.05 bars grantor action that has "substantially adverse although not lethal effects"); *Conrad's Sentry, Inc. v. Supervalu, Inc.*, 357 F. Supp. 2d 1086, 1099–100 (W.D. Wis. 2005) (substantial change in competitive circumstances includes changes "that were discriminatory or that were intended as constructive termination"); *Astleford Equip. Co., Inc. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 191 (Minn. 2001) ("substantial change in the competitive circumstances" is one "that is material to the continued existence of the dealership, one that significantly diminishes its viability, its ability to maintain a reasonable profit over the long term or to stay in business").  However, non-discriminatory, system-wide changes do not generally constitute a "substantial change in competitive circumstances."  *See East Bay Running Store, Inc. v. NIKE*, 890 F.2d 996, 999–1000 (7th Cir. 1989) (WFDL provision forbidding substantial change is intended to protect the dealer from constructive termination, not "non-discriminatory system-wide changes"); *Remus*, 794 F.2d at 1240–41 (same).

Wineinger makes two arguments as to how American Dairy Queen's actions amount to a "substantial change to the competitive circumstances of the dealership agreement."  First, he argues that requiring a proposed successor owner to sign a new franchise agreement as a

condition of American Dairy Queen approving a transfer will force the transferee to pay additional annual royalties, advertising and sales promotion fees.  He also points out that there are other differences between the original and new agreements, including the territory, menu and renewal terms.  The problem with this argument, however, is that these changes would apply to the new owner, *not* Wineinger as the existing dealer.  Indeed, to this day, Wineinger's operation of the Sparta Dairy Queen has not been altered at all by American Dairy Queen's conditions, at least not in a manner in which he is complaining.  And Wineinger has cited no legal authority to support his argument that an alteration to the competitive circumstances of a *future* owner, who was not a party to the original dealer agreement, is relevant to a § 135.03 analysis.

Second, Wineinger argues that requiring a buyer to sign American Dairy Queen's current franchise agreement will significantly reduce the price any buyer will pay Wineinger for the Sparta Dairy Queen store.  Again, however, Wineinger has cited no legal authority to support his argument that a reduction in the price a potential buyer will pay for a franchise constitutes the type of "substantial change to the competitive circumstances" that is prohibited by the WFDL.  Instead, persuasive authority suggests that such a change does not amount to a "substantial change to the competitive circumstances." *See Bobcat of Duluth, Inc. v. Clark Equip. Co.*, No. CV 16-1007 (PAM/LIB), 2018 WL 559531, at *3 (D. Minn. Jan. 25, 2018) (Bobcat's conditioning consent of transfer of a dealer agreement on prospective buyer agreeing to Bobcat's exclusivity policy did not "substantially change the competitive circumstances of a dealership agreement," even though Bobcat's decision reduced the potential purchase price by 50%, because the decision did not impair the dealer's ability to stay in business, operate its dealership under its dealer agreement or maintain a reasonable profit.)  In this instance,

Wineinger has not shown that a reduction in the purchase price, caused by a non-discriminatory system-wide change in the franchise agreement, would threaten the franchise's viability, would amount to a constructive discharge, or would otherwise impair Wineinger's, or a potential buyer's, ability to maintain a profit over the long-term.  Accordingly, his WFDL claim fails.

Of course, as previously noted, even if the imposition of a requirement that a new dealer sign the current franchise agreement were deemed a "substantial change" to Wineinger's competitive circumstances, there is still no violation of the WFDL because no reasonable jury could find American Dairy Queen lacked an "objectively ascertainable need" to update its franchise agreement as new dealers come on board within the meaning of *Ziegler* and *Morely-Murphy*, and there is *no* evidence that American Dairy Queen is not applying that requirement in a non-discriminatory manner,  Hence, again, Wineinger's WFDL claim fails.

Accordingly, American Dairy Queen is entitled to an award of summary judgment on all of Wineinger's counterclaims and entry of a declaratory judgment establishing its right to condition any sale of Wineinger's franchise agreement on the new owner signing its current franchise agreement.

ORDER

IT IS ORDERED that:

1) Plaintiff American Dairy Queen Corporation's motion for summary judgment (dkt. #31) is GRANTED.

2) It is DECLARED that American Dairy Queen may condition approval of a transfer or assignment of Wineinger's Franchise Agreement on the new owner signing a current franchise agreement without being liable for breaching the agreement, violating the implied covenant of good faith and fair dealing, or violating the Wisconsin Fair Dealership Law.

3) Defendant David Wineinger's motion for summary judgment (dkt. #27) is DENIED.

4) The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 1st day of August, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

20